KISTLER, J.
**123 Defendant was arrested for driving under the influence of intoxicants (DUII) and advised of his Miranda rights. In response, he invoked his right to counsel. Afterwards, the arresting officer asked defendant 28 DUII interview questions and then asked if he would consent to a breath test. Defendant moved to suppress his answers to the 28 questions and all derivative evidence, which he argued included his decision to take the breath test and the test results. The state, for its part, conceded that asking defendant the 28 DUII interview questions after he had invoked his right to counsel violated Article I, section 12, of the Oregon Constitution. The state took the position, however, that suppressing the officer's questions and defendant's answers was sufficient to vindicate that right. The Court of Appeals agreed and also observed that asking defendant for consent to take a breath test did not constitute prohibited "interrogation" under Article I, section 12. State v. Swan , 276 Or. App. 192, 366 P.3d 802 (2016). We allowed defendant's petition for review to consider those issues and now reverse the Court of Appeals decision and the trial court's judgment.
I. FACTUAL AND PROCEDURAL BACKGROUND
This case arises out of defendant's claims that the arresting officer violated his right to counsel under Article I, section 11, and Article I, section 12, of the Oregon Constitution. Before setting out the facts, we first describe briefly those two state constitutional sources of a right to counsel.
Article I, section 11, provides that, "[i]n all criminal prosecutions, the accused shall have the right *** to be heard by *** counsel."
*11 Ordinarily, the Article I, section 11, right to counsel does not attach until indictment. State v. Sparklin , 296 Or. 85, 92, 672 P.2d 1182 (1983) ; see State v. Davis , 350 Or. 440, 256 P.3d 1075 (2011) (analyzing the history of Article I, section 11 ). However, this court has held that an Article I, section 11, right to counsel can attach before indictment when a driver is arrested for DUII. State v. Spencer , 305 Or. 59, 74, 750 P.2d 147 (1988) ; see State v. Durbin , 335 Or. 183, 63 P.3d 576 (2003) (same).
**124 A DUII suspect's pretrial Article I, section 11, right to counsel is "not as broad as the [ Article I, section 11,] right to counsel that an accused enjoys at trial." Durbin , 335 Or. at 189, 63 P.3d 576. The right arises only "upon request" and consists of a "reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test." Spencer , 305 Or. at 74, 750 P.2d 147 ; see Durbin , 335 Or. at 193-94, 63 P.3d 576 (holding that the right to consult with counsel regarding whether to take a breath test ordinarily includes the right to do so privately).
A suspect also has an Article I, section 12, right to counsel that derives from the state constitutional Miranda right. State v. Haynes , 288 Or. 59, 71, 602 P.2d 272 (1979). That right attaches when a suspect who is in custody or compelling circumstances invokes the right. See State v. Roble-Baker , 340 Or. 631, 637-38, 136 P.3d 22 (2006) (explaining when Article I, section 12, rights attach). Once a suspect invokes his or her Article I, section 12, right to counsel, the suspect " 'is not subject to further interrogation by the authorities until counsel has been made available to him,' " unless the suspect initiates a dialogue that leads to further questioning. State v. Kell , 303 Or. 89, 96, 734 P.2d 334 (1987) (quoting Edwards v. Arizona , 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ).
Not all direct questions constitute "interrogation" for the purposes of Article I, section 12. State v. Boyd , 360 Or. 302, 317-18, 380 P.3d 941 (2016). Rather, "interrogation" refers to statements or questions, other than questions normally attendant to arrest and custody, that are reasonably "likely to elicit an incriminating response." Id. at 312, 316-18, 380 P.3d 941 ; State v. Scott , 343 Or. 195, 202-03, 166 P.3d 528 (2007). For several years, the Court of Appeals has held that officers may ask a person arrested for DUII whether he or she will take a breath or blood test without violating Miranda . It has reasoned that asking a DUII suspect to take a breath test is a question that is normally attendant to arrest and custody and thus does not constitute "interrogation" for the purposes of Article I, section 12. State v. Higley , 236 Or.App. 570, 573, 237 P.3d 875 (2010) ; State v. Gardner , 236 Or.App. 150, 154-55, 236 P.3d 742, rev. den. , 349 Or. 173, 243 P.3d 468 (2010) ; see State v. Cunningham , 179 Or.App. 498, 502, 40 P.3d 535, rev. den. , **125 334 Or. 327, 52 P.3d 435 (2002) (discussing related issue). With that background in mind, we turn to the facts in this case.
A. Facts
At approximately 3:00 a.m., Officer Enz received a report of a traffic accident.[1] When he arrived at the scene of the accident, he saw a Dodge truck abandoned in the middle of an intersection and a Subaru Outback nearby. Defendant was sitting in the driver's seat of the Subaru. The officer noticed that defendant's "eyes [were] closed and his head kept bobbing forward." When the officer knocked on the window to get defendant's attention, defendant tried to roll the window down. After "several failed attempts at finding the window lever," defendant opened the door. After speaking with defendant, the officer determined that defendant appeared to be intoxicated "based on his slurred speech, an odor of an alcoholic beverage that was emanating from him, and [the fact that] his eyes were watery and bloodshot."
Based on those observations, the officer told defendant that he believed it was likely that defendant was impaired, and he asked defendant if he would perform field sobriety *12 tests. In response, defendant asked for "an opportunity to speak with his attorney." Officer Enz said that, "if [defendant] had a cell phone *** he could call the attorney from the car." Defendant "started dialing a phone, so [the officer] closed the car door and went to go take measurements of the scene." Approximately 11 minutes later, the officer went back to defendant and asked if "would like to perform the voluntary field sobriety tests." Defendant asked, "What exactly are you asking me to do?" The officer described the tests, and defendant repeated everything that the officer said into his phone. Defendant then said to the officer, "Yes. Yes, I will."
Defendant did not do well on the field sobriety tests, and Officer Enz told him that he was under arrest for DUII and advised him of his Miranda rights. Among other things, Enz told defendant that "[h]e ha[d] the right to have an **126 attorney with him while he's being questioned." After being advised of those rights, defendant's "first response was that he wanted to talk to his attorney." The officer explained that defendant would have "another opportunity to consult with somebody privately when [they] got back to the precinct." Defendant responded, " 'Yes. *** Yes, I understand my rights.' " The officer did not ask defendant any questions between the second time defendant invoked his right to counsel and the time they arrived at the precinct.
When they got to the precinct, the officer provided defendant with his cell phone, a landline, a phone book, and a copy of the Implied Consent Combined Report. He told defendant that "he could make as many calls as he'd like to whomever he'd like and that [the officer would] be closing the cell door to provide him privacy while he was on the phone." After explaining the procedure for the breath test, the officer closed the cell door at 3:47 a.m. Twenty minutes later, the officer returned and found defendant still on the phone. The officer told defendant that he would "give him another minute or so to complete his phone call, closed the cell, and again checked on him at 4:10 a.m. and found that he was finishing his phone call."
The officer took defendant to another room, began the 15-minute observation period required before administration of a breath test, "conducted the DUII Interview Report[,] and read him the Implied Consent Combined Report in its entirety verbatim." In conducting the DUII interview report, the officer asked defendant "28 questions in multiparts."[2] Neither the officer's questions nor defendant's answers are included in the record.[3] Similarly, a copy of the Implied Consent Combined Report is not included in **127 the record, although Enz testified at the hearing regarding three warnings included in the report.[4]
Having gone through that procedure, Enz asked defendant if "he'd take a breath test." Defendant did not answer but "just stared at [the officer] and started reading the Implied Consent Combined Report." Enz told him that he would "give him a moment to think about it and that [he would] be asking him *13 again when he started [the breathalyzer machine]." At that point, defendant said that he "would like to speak with his attorney before he answered that question," and Enz "explained to [defendant] that he'd already been given ample time to consult with someone for legal advice, both at the scene and at the precinct." "At that point, [Enz asked defendant] if he would take a breath test, to which he said, 'Yes.' " The breath test showed that defendant's blood alcohol content (BAC) was .18.
B. Trial and Appellate Proceedings
The state charged defendant with DUII and reckless driving. Before trial, defendant filed two motions to suppress the statements that he made to Officer Enz in response to the questions on the DUII interview report and any derivative evidence. The first motion contended that Enz had violated Article I, sections 11 and 12, by asking defendant questions from the DUII interview report after he had invoked his right to counsel. Defendant's second motion claimed that defendant's statements were involuntary because Enz repeatedly had disregarded defendant's invocation of his right to counsel.
In response to defendant's motions, the state conceded that asking defendant the questions from the DUII
**128 interview report after he invoked his right to counsel violated Article I, section 12. It explained that, as a result, it would not ask Enz at the suppression hearing about either the questions he asked or the answers defendant gave to those questions. Apparently, in the state's view, no more was needed to remedy the Article I, section 12, violation. Additionally, the state argued that it had complied with Article I, section 11, by giving defendant the opportunity to consult with his attorney before deciding whether to take the breath test. The state did not address whether defendant's decision to take the breath test and the resulting test results derived from the conceded Article I, section 12, violation.
In considering the parties' arguments, the trial court focused on defendant's Article I, section 11, right to counsel. It concluded that, because Enz had provided defendant with a reasonable opportunity to consult with counsel before deciding whether to take the breath test, defendant's decision to take the test and the test results were admissible. The court accordingly denied defendant's motions to suppress. Given the trial court's ruling on his suppression motions, defendant agreed to a stipulated facts trial based on the evidence brought out at the suppression hearing. After considering that evidence, the trial court convicted defendant of DUII and reckless driving.
On appeal, defendant challenged the trial court's ruling denying his suppression motions, although his appellate arguments were narrower than his arguments at trial. On appeal, defendant expressly abandoned his argument that Enz had violated his Article I, section 11, right to counsel. He limited his arguments instead to Article I, section 12. Specifically, defendant argued that Enz had violated Article I, section 12, by eliciting his answers to the 28 DUII interview questions after he had invoked his right to counsel and that his consent to take the breath test and the test results should be suppressed because they derived from his answers to those questions. Defendant did not argue on appeal that, once he invoked his Article I, section 12, right to counsel, Enz could not ask him whether he would take a breath test; that is, defendant did not argue that asking **129 whether he would take a breath test constituted "interrogation" in violation of his Article I, section 12, right to counsel.
In analyzing defendant's arguments, the Court of Appeals began by noting that it had "unequivocally rejected the proposition that asking a person to take a breath test is 'interrogation' " for the purposes of Article I, section 12. Swan , 276 Or.App. at 201, 366 P.3d 802 (citing Court of Appeals decisions). The Court of Appeals then turned to defendant's claim that the results of that test derived from his answers to the DUII interview report.
Applying a series of factors identified in State v. Jarnagin , 351 Or. 703, 277 P.3d 535 (2012), the Court of Appeals reasoned that two factors supported defendant's position. There was no break in time or space between the violation of defendant's rights and his decision to take the breath test, and defendant *14 had remained in custody throughout that period. The Court of Appeals reasoned, however, that the violation in this case was not as flagrant as a violation in an earlier case, that reading defendant the Implied Consent Combined Form provided a "short, yet significant break" between the violation and his decision to take the breath test, and that the officer's request to take the breath test had not been prompted by defendant's answers to the interview questions. See Swan , 276 Or.App. at 203-06, 366 P.3d 802. Weighing those factors, the Court of Appeals concluded that defendant's decision to take the breath test did not derive from the conceded Article I, section 12, violation and affirmed the trial court's judgment. Id. at 206-07, 366 P.3d 802.
II. ISSUES ON REVIEW
On review, defendant argues that his breath test results should be suppressed for two reasons. He argues initially that, once he invoked his right to counsel, no further interrogation could occur without his counsel present and that asking whether he would take a breath test constituted "interrogation" prohibited by Article I, section 12. Additionally, he argues that, even if asking him to take a breath test did not constitute interrogation, his decision to take the breath test and the results of that test were the product of the officer's earlier Article I, section 12, violation and should be suppressed for that reason.
**130 Defendant did not raise the first issue-whether asking if he would take a breath test constituted interrogation-in either the trial court or the Court of Appeals, and it is questionable whether he can raise that issue for the first time in this court. However, we need not answer that procedural question to decide this case. Even if the first issue were properly before us and even if Article I, section 12, did not preclude Enz from asking defendant if he would take a breath test, as the Court of Appeals has held, we conclude that defendant's decision to take the breath test and the subsequent test results were the product of the preceding constitutional violation and should have been suppressed for that reason. It follows that any resolution of the first issue that defendant raises on review, even if preserved, would not change the result in this case. We accordingly turn to the single issue that defendant has raised throughout this litigation: whether his decision to take the breath test derived from the immediately preceding Article I, section 12, violation.
In response to that issue, the state advances two separate arguments why the breath test results did not derive from the conceded Article I, section 12, violation. The state's first argument starts from the proposition that "a person lawfully arrested for DUII has no legal right to refuse a breath test administered pursuant to the implied-consent law." It follows, the state concludes, that Enz's administration of the breath test resulted from the operation of the implied-consent law rather than his violation of defendant's Article I, section 12, right to counsel. The state's second argument tracks, in large part, the Court of Appeals' reasoning. Relying on our decision in State v. Delong , 357 Or. 365, 350 P.3d 433 (2015), the state contends that "defendant's decision to submit to the breath test was an act of voluntary consent," which broke the causal chain between the Article I, section 12, violation and the breath test results. We begin with the state's second argument.
A. Causal Chain
In deciding the state's second argument, we note, as an initial matter, that the results of a breath test are not themselves testimonial; a breath test is a search of the **131 person's breath that reveals a physical fact, the percentage of alcohol in a person's blood. State v. Fish , 321 Or. 48, 62, 893 P.2d 1023 (1995). That said, the analysis used to determine whether evidence derives from a prior Miranda violation does not vary depending on whether the challenged evidence is testimonial or physical. State v. Vondehn , 348 Or. 462, 475-76, 236 P.3d 691 (2010) ; see id. at 487, 236 P.3d 691 (Linder, J., concurring) (explaining that, when officers fail to provide the requisite Miranda warnings, "we properly ask whether any subsequently obtained evidence, physical or testimonial, is sufficiently a product of that violation to require *15 suppression along with any statements made in direct response to unwarned custodial interrogation"). We also note that the question whether testimonial or physical evidence derives from a prior Miranda violation cannot be reduced to a mechanical formula but will vary depending on the totality of the circumstances. See Delong , 357 Or. at 373, 350 P.3d 433 (applying the Jarnagin factors to determine whether the defendant's invitation to search his car broke the causal chain between a prior Miranda violation and evidence found as a result of the search).
As we did in Delong , we look to the factors set out in Jarnagin in deciding whether the breath test results were admissible because defendant's decision to take the breath test broke the causal chain between the prior Article I, section 12, violation and his breath test results. Specifically, we consider, among other things:
" 'the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements.' "
Delong , 357 Or. at 373, 350 P.3d 433 (quoting Jarnagin , 351 Or. at 716, 277 P.3d 535 ).
In this case, we begin, as the Court of Appeals did, with the second and third factors-"the amount of time between the violation and any later statements" and "whether the suspect remained in custody before making any later statements." See Jarnagin , 351 Or. at 716, 277 P.3d 535 (listing those factors). Here, no time elapsed between the questions that **132 Enz asked in violation of defendant's right to counsel and his question whether defendant would take a breath test. The latter followed immediately on the former. Moreover, defendant remained in custody throughout that time. Thus, there was no break in time, place, or custody between the officer's repeated Article I, section 12, violation and defendant's decision to take the breath test that might have attenuated the effect of the violation. This is instead a case in which the prior illegality and defendant's decision to take the breath test "blended into a 'continuum.' " See Jarnagin , 351 Or. at 722, 277 P.3d 535 (quoting Missouri v. Seibert , 542 U.S. 600, 617, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality) ).
Not only do the second and third factors suggest that defendant's decision to take the breath test was the product of the immediately preceding Miranda violation, but the fifth factor identified in Jarnagin - "the use that the state has made of the unwarned statements"-provides no reason to reach a different conclusion. As noted above, the record does not disclose the 28 questions that the officer asked defendant after he invoked his right to counsel. More importantly, it does not disclose defendant's answers to those questions.[5] Without that information, there is no way of knowing whether the answers that the officer elicited from defendant in violation of Article I, section 12, affected defendant's subsequent decision to consent. That is, there is no way of knowing on this record whether the officer's illegal interrogation "left 'little, if anything of incriminating potential *** unsaid' " and effectively made defendant's decision to take the breath test a foregone conclusion. See Jarnagin , 351 Or. at 722, 277 P.3d 535 (quoting Seibert , 542 U.S. at 617, 124 S.Ct. 2601 ). Conversely, there is no way of knowing whether the answers that defendant gave in response to the officer's questions were exculpatory and thus unlikely to have affected his decision to take the breath test. See Delong , 357 Or. at 380, 350 P.3d 433 (concluding that defendant's invitation to search his car was not a product of his unwarned exculpatory response).
**133 The state bears the burden of production and persuasion to show that defendant's decision to take the breath test was not the *16 product of Enz's violation of defendant's Article I, section 12, right to counsel. See State v. Unger , 356 Or. 59, 74-75, 333 P.3d 1009 (2014) (so stating in the context of an Article I, section 9, violation); cf. Vondehn , 348 Or. at 476-77, 236 P.3d 691 (suppressing evidence when the state failed to argue that the evidence did not derive from a prior Article I, section 12, violation). It may be, as the state argues, that Enz's decision to ask defendant to take a breath test was not prompted by defendant's answers to the officer's questions. However, that reasoning fails to take into account how the answers that Enz obtained in violation of Article I, section 12, affected defendant's decision to take the breath test. Without knowing what Enz asked and what defendant answered, we have no way of determining that defendant's decision did not derive from the immediately preceding violation of his Article I, section 12, right to counsel. See Vondehn , 348 Or. at 490, 236 P.3d 691 (Linder, J., concurring) (concluding that, in the absence of circumstances demonstrating otherwise, the defendant's consent to search derived from two short questions asked in violation of Miranda ).
The first Jarnagin factor-the nature of the violation-also cuts against the state's argument. The Miranda violation in this case differs from the Miranda violations in Vondehn , Jarnagin , and Delong . In those cases, officers failed to advise suspects of their rights, and in assessing the nature of the violation, we asked whether the failure to warn was egregious or flagrant. For example, we noted that the violation in Jarnagin was not flagrant. As we explained, that case was not one "in which the officers advised defendant of his Miranda rights and then proceeded to question him despite his repeated requests for counsel, as the officers did in [ State v. Foster , 288 Or. 649, 607 P.2d 173 (1980) ] and [ State v. Mendacino , 288 Or. 231, 603 P.2d 1376 (1979) ]." Jarnagin , 351 Or. at 717, 277 P.3d 535. Rather, Jarnagin was a case in which "the officers failed to recognize that the circumstances had become sufficiently compelling to require Miranda warnings." Id. Delong was to the same effect. See 357 Or. at 379, 350 P.3d 433. In that case, we explained that, although the officer's question "went too far" and should have been **134 preceded by Miranda warnings, his question was not dissimilar from a question that the Court of Appeals had held was constitutionally permissible without prior warnings. Id.
In this case, by contrast, Enz expressly advised defendant of his Miranda rights and told him that, among other rights, "[h]e ha[d] the right to have an attorney with him while he's being questioned." After being advised of that right, defendant expressly invoked his right to counsel's assistance in responding to Enz's questions. Despite that invocation, Enz then asked defendant 28 questions. Given the state's concession that Enz could not ask those questions, we conclude that the violation was flagrant and repeated. And, as we explained in Unger , the flagrancy of a constitutional violation is relevant in a rights-based suppression analysis because "unlawful and lengthy in-custody questioning is more likely to affect the defendant's decision to consent than more restrained behavior." 356 Or. at 82, 333 P.3d 1009.
We recognize, as we did in Unger , that the question is one of degree and that, in this case, Officer Enz did not otherwise engage in overreaching or overbearing conduct. Moreover, Enz had allowed defendant the opportunity to talk with his lawyer by phone before questioning defendant in derogation of his request for counsel. Although those actions mitigated the effect of Enz's violation, Enz's repeated disregard for defendant's expressed right to counsel "place[d defendant] in a more disadvantaged position, making it easier and more likely for [Enz] to exploit that illegality to obtain consent." Unger , 356 Or. at 82, 333 P.3d 1009. On balance, the nature of the violation cuts against the state's argument that defendant's decision to take the breath test was independent of the immediately preceding violation of defendant's request for counsel.[6]
*17 The remaining factor noted in Jarnagin is whether subsequent events dissipated the taint of the earlier violation. On that issue, we note that defendant had an opportunity to **135 speak with his lawyer before Enz questioned him in violation of his rights. After questioning defendant in violation of Article I, section 12, Enz then asked defendant if he would consent to take the breath test. At that point, defendant asked to speak to his lawyer, and Enz denied his request. Far from dissipating the taint of the preceding Article I, section 12, violation, the officer's subsequent denial reinforced it.
It is true, as the state argues, that Enz read defendant the Implied Consent Combined Report "in its entirety verbatim" after defendant answered the questions on the DUII interview report. As noted above, however, the Implied Consent Combined Report is not part of this record. We do not know what the report in its entirety said, although Enz did testify regarding three admonitions contained in the report. Enz testified at the suppression hearing that he warned defendant that, if he refused to take a breath test, he would lose his license to drive, he would be subject to a $650 fine, and "evidence of [his] refusal would be used against him in court." That advice parallels some of the consequences that Oregon statutes require officers to read DUII suspects before asking them to take a breath test. See State v. Moore , 354 Or. 493, 318 P.3d 1133 (2013) (discussing that advice).
We held in Moore that advising a DUII suspect of the consequences of refusing to take a breath test did not render the suspect's decision to take the breath test involuntary. Id. at 503, 318 P.3d 1133.[7] However, advising a DUII suspect of the adverse consequences of refusing to take a breath test is intended **136 to weight the suspect's decision towards taking the test. See Spencer , 305 Or. at 71, 750 P.2d 147 (identifying that goal). Warning defendant of the adverse consequences of refusing to take the test would have tilted his decision towards submitting to the test. Put differently, this record does not disclose any intervening information that Enz told defendant that would have reminded him that he was free not to take the breath test. Cf. Vondehn , 348 Or. at 485-86, 236 P.3d 691 (concluding that, in the circumstances of that case, belated Miranda warnings were "an objective indication that the situation had changed and was governed by new rules").
Considering the factors set out in Jarnagin , we are not persuaded by the state's argument that defendant's decision to submit to the breath test in this case was comparable to the defendant's invitation in Delong for the officers to search his car. In Delong , the violation of the defendant's rights was minimal; here, it was flagrant. In Delong , the defendant invited the officers to search his car unprompted by any express request for consent to search. 357 Or. at 368, 379, 350 P.3d 433.[8] In this case, by contrast, Enz expressly asked defendant if he would take a *18 breath test and then warned him that, if he refused, he would lose his driver's license, he would be fined $650, and his refusal would be used against him in court. Finally, in Delong , the record disclosed that the defendant's answer to the officer's single unwarned question was exculpatory and thus unlikely to have led him to invite the officers to search his car. Id. at 380, 350 P.3d 433. Here, there was no evidence of what defendant said in response to the officer's 28 questions and no way of knowing whether or how defendant's decision to take the test was causally connected to his earlier responses. On this record, we cannot say, as we did in Delong , that the "defendant's invitation to search his car attenuated the taint flowing from [the officer's] unwarned question." Id. at 380, 350 P.3d 433. Rather, we conclude that the state failed to prove that defendant's decision to take the breath test did not derive from the preceding repeated violation of defendant's Article I, section 12, right to counsel. **137 In Spencer , we suppressed the defendant's breath test results because his decision to submit to the test was the product of a violation of his Article I, section 11, right to counsel. 305 Or. at 75-76, 750 P.2d 147 ; see also Durbin , 335 Or. at 194, 63 P.3d 576 (suppressing evidence of the defendant's breath test results when the defendant's decision to submit to a breath test was a product of an Article I, section 11, violation). Ordinarily, it would seem that our decision in Spencer would lead to the same result in this case, where defendant's decision to submit to the breath test was the product of a violation of his Article I, section 12, right to counsel. However, the state argues we can affirm the trial court's judgment on an alternative ground. It contends that, even if defendant's decision to take the breath test was the product of an Article I, section 12, violation, his breath test results derived from an independent source: the implied-consent statutes. We turn to that argument.
B. Implied Consent
The state notes that, under the terms of ORS 813.100(1), defendant impliedly consented to take a breath test to determine his BAC by driving on the public highways. It contends that, as a result of that implied consent, defendant had no legal right to refuse to take a breath test when, at a later point, he was arrested for DUII. In the state's view, defendant had only a physical right to refuse to submit to the test. The state reasons that, because defendant had no legal right to refuse a breath test, it is immaterial whether his decision to submit to a breath test was the product of an earlier Article I, section 12, violation.
The state adds that, in making its implied-consent argument, it is not relying on defendant's consent to take a breath test to justify its warrantless seizure and search of his breath. It reasons that that it could seize and search defendant's breath to determine his BAC either as a search incident to arrest under the reasoning in Birchfield v. North Dakota , --- U.S. ----, 136 S.Ct. 2160, 195 L.Ed.2d 560 (2016), or under the exigent circumstances doctrine applied in State v. Machuca , 347 Or. 644, 227 P.3d 729 (2010).[9] Thus, **138 in the state's view, the warrantless search authorized by Oregon's implied consent laws is one that is constitutionally permissible, even if it is not one that can be sustained as a consent search for constitutional purposes. *19 The initial proposition on which the state's implied-consent argument turns is that, having impliedly consented to take a breath test by driving on the public highways, defendant had no legal right to refuse to take a breath test when he was later arrested for DUII. In asserting that proposition, the state relies on statements taken from our decisions that, in context, may have less significance than the state perceives. In analyzing the state's implied-consent argument, we begin with the text of the implied-consent statutes and explain why the text of those statutes does not support the state's argument. We then turn to the statements from our decisions on which the state relies.
The relevant text of the implied-consent statutes is fairly straightforward. ORS 813.100(1) provides that "[a]ny person who operates a motor vehicle upon *** the highways of this state shall be deemed to have given consent, subject to the implied consent law, to a chemical test of the person's breath" to determine the person's BAC if the person is arrested for DUII. ORS 813.100(2) then provides that, if a person who is arrested for DUII "refuses the request of a police officer to submit to the chemical test after the person has been informed of consequences and rights as described in ORS 813.130," "[n]o chemical test of the person's breath *** shall be given under subsection (1) of this section."
**139 As we read those two subsections, the fact that a person impliedly consented to a breath test by driving on the public highways does not foreclose that person from later refusing to take a breath test if and when the person is arrested for DUII. Rather, ORS 813.100(2) expressly recognizes that a person arrested for DUII may decide, at the point of arrest, to refuse to submit to a breath test and that the person's refusal limits the state's ability to determine his or her BAC under the implied-consent statutes. Specifically, ORS 813.100(2) provides that, if a person arrested for DUII refuses to submit to a breath test, "[n]o chemical test of the person's breath *** shall be given" under the implied-consent statutes, although the state can always apply for a warrant to determine a suspect's BAC. See State v. Ritz , 361 Or. 781, 796, 399 P.3d 421 (2017) (stating that proposition).[10]
The implied-consent statutes thus provide that, notwithstanding the consent implied by driving on the public highways, a DUII suspect retains a statutory right to refuse to take a breath test at the point of arrest. Our decision in Spencer confirms that reading of the statutory text. In interpreting the implied-consent statutes, Spencer explained that, having impliedly consented to take a breath test by driving on the public highways, a DUII suspect has no legal right to refuse to submit to a breath test. 305 Or. at 71, 750 P.2d 147. However, Spencer then held that a DUII suspect has an Article I, section 11, "right upon request to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test." Id. at 74, 750 P.2d 147. That is, the court recognized that, despite having impliedly consented to take a breath test, a DUII suspect has a statutory right under ORS 813.100(2) to decide, at the point of arrest, whether to submit to the test and a state constitutional right to seek legal advice before making that decision.
**140 Moreover, this court held in Spencer that, when a suspect's decision to submit to a breath test derives from a violation of his or her Article I, section 11, right to counsel, both the decision and the test results are subject to suppression. Id. at 75-76, 750 P.2d 147 ; see Durbin , 335 Or. at 194, 63 P.3d 576 (same). The state advances no reason why we should reach a different conclusion when, in this case, defendant's decision to take the breath test derived from a violation of his *20 Article I, section 12, right to counsel rather than a violation of his Article I, section 11, right to counsel. Given the text of the implied-consent statutes and our decision in Spencer , we do not agree with the state that, in light of the consent implied as a result of driving on the public highways, it is immaterial that defendant's later decision to take a breath test was the product of an Article I, section 12, violation.
The state, however, presses its argument that our decisions interpreting the implied-consents statutes lead to a different conclusion, and we address that argument briefly. As we understand the state's argument, it relies primarily on statements that this court made in State v. Cabanilla , 351 Or. 622, 273 P.3d 125 (2012). In our view, a trilogy of decisions that preceded Cabanilla - State v. Scharf , 288 Or. 451, 605 P.2d 690, reh'g den. , 288 Or. 621, 605 P.2d 690 (1980) ; State v. Newton , 291 Or. 788, 799-800, 636 P.2d 393 (1981) ; and Spencer - help put the statements in Cabanilla in perspective. We begin with that trilogy and then turn to Cabanilla .
In interpreting the implied-consent statutes, one of the questions that initially divided this court was whether the statutory right to refuse a breath test at the point of arrest should be interpreted as requiring, as a statutory matter, that the suspect actually consent to a breath test. In Scharf , this court concluded that it did. It described the consent to take a breath test implied by driving on the public highways as a "statutory fiction," and it held that the right to refuse a breath test, now codified as ORS 813.100(2), demonstrated a legislative intent to require that a DUII suspect actually consent to a breath test at the point of arrest. 288 Or. at 457-58,, 605 P.2d 690. Having concluded that the implied-consent statutes required a suspect's actual consent before a breath test could be administered, Scharf also found a statutory right to **141 consult with counsel before deciding whether to consent. Id. at 460-62, 605 P.2d 690. In effect, Scharf found in the statute a requirement that an exception to the warrant requirement-actual consent-be present before the breath test could be administered statutorily and, by implication, constitutionally.
One year later, a plurality of the court read the implied-consent statutes differently. Newton , 291 Or. at 799-800, 636 P.2d 393. The plurality explained that states across the country had enacted implied-consent statutes in response to Rochin v. California , 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Newton , 291 Or. at 793-94, 636 P.2d 393. Specifically, there was a concern that the due process prohibition recognized in Rochin against forcing a defendant to regurgitate the contents of his stomach would extend to other bodily invasions to obtain evidence of a crime, including taking breath and blood samples to determine a driver's BAC. Id. To avoid those perceived due process problems, states enacted implied-consent statutes as a way of securing a DUII suspect's cooperation in taking a breath test without using physical force.[11] Consistently with Rochin , implied-consent statutes required states to respect a DUII suspect's right to refuse to take a breath test but also required that a DUII suspect be advised of the adverse consequences of refusal to induce the suspect's cooperation. Id. at 799-800, 636 P.2d 393.
In the plurality's view, Scharf misread Oregon's implied-consent statutes when it inferred from the statutory ability to refuse a breath test a statutory requirement of actual consent and a corresponding statutory right to a reasonable opportunity to consult with counsel before deciding whether to take a breath test. Id. at 798-99, 636 P.2d 393. The plurality summarized its statutory analysis as follows:
"[R]efusal as contemplated by the statute is something other than withholding of consent because consent is legally implied. It is a refusal to comply with the consent which has already been given as a condition of a license to drive.
**142 The purpose of a warning of license suspension following a *21 refusal is to overcome an unsanctioned refusal by threat instead of force. It is not to reinstate a right to choice, let alone a voluntary and informed choice, but rather to nonforcibly enforce the driver's previous implied consent."
Id. at 793, 636 P.2d 393.
As we read the quoted passage, the plurality relied on the fact that a suspect's consent was "legally implied" to determine that a suspect's ability to refuse a breath test did not require, as a statutory matter, that the suspect actually consent. The point, however, was not that a DUII suspect has no statutory right to refuse a breath test. ORS 813.100(2) clearly recognizes that right if and when the suspect is arrested for DUII. Nor was the point of the passage to say that a suspect's statutory decision to refuse a breath test is immaterial. ORS 813.100(2) prohibits the state from obtaining a breath test under the implied-consent statutes if the suspect refuses. Indeed, the plurality expressly recognized that the consent implied from driving on public highways does not provide an independent ground for obtaining a DUII suspect's BAC.[12] Id. at 801, 636 P.2d 393. Given that recognition, we hesitate to read other statements in Newton as standing for the proposition that, because defendant was legally obligated to submit to a breath test, it is immaterial whether his decision to submit to the breath test was the product of a constitutional violation.
The final case in the trilogy is Spencer . In that case, the court reexamined the implied consent statutes in light of the conflicting opinions in Scharf and Newton . 305 Or. at 70, 750 P.2d 147. Although the court did not agree with all of the plurality opinion in Newton , it did agree with the plurality's interpretation of the implied-consent statutes. It reasoned:
"We agree with the Newton plurality that the statute's references to a driver's 'refusal' do not evince a legislative concern that the driver make a voluntary and fully informed decision whether to submit to the test. Consent being implied by law, a driver may not legally refuse. A driver, **143 however, can physically refuse to submit, and the implied consent law, recognizing that practical reality, forbids the use of physical force to compel submission. The history and development of the implied consent law, as outlined by the dissent in Scharf and by the plurality in Newton , suggest that the advice to be given an arrestee was intended to provide an additional incentive, short of physical compulsion, to induce submission."
Spencer , 305 Or. at 71, 750 P.2d 147 (footnotes omitted).
Spencer accordingly agreed with the Newton plurality that, for the purposes of the implied-consent statutes, a DUII suspect's consent to take a breath test is legally implied by driving on the public highways and that the implied-consent statutes do not themselves require either actual consent or the opportunity to consult with counsel before deciding whether to submit to a breath test, as Scharf had held. However, Spencer recognized that, under the implied-consent statutes, a suspect may physically refuse to take a breath test, and it held that Article I, section 11, gives the suspect "the right upon request to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test." 305 Or. at 74, 750 P.2d 147. Moreover, as discussed above, the court held that, if the suspect's decision to take the test derives from a violation of the suspect's Article I, section 11, right to counsel, the breath test results are subject to suppression. Id. at 75-76, 750 P.2d 147.[13]
*22 At first blush, one sentence in Spencer 's description of the implied-consent statutes appears to support the state's argument: "Consent being implied by law, a driver may not legally refuse." Id. at 71, 750 P.2d 147. Specifically, if "a driver may not legally refuse" to take a breath test, then the state's argument that defendant's submission to the breath test was required by operation of law appears to have some force. However, we hesitate to read too much into that one sentence for three reasons. First, that sentence summarizes in an **144 epigrammatic way the gist of the implied-consent statutes. It does not purport to be a complete explanation of the terms or operation of those statutes. The second reason is related to the first; it is difficult to reconcile Spencer 's quick summary of the implied-consent statutes with the actual text of those statutes. As explained above, the text of the implied-consent statutes recognizes that a driver retains a right to decide, at the point of arrest, whether to take a breath test and also that a driver's decision to refuse to take the test limits the state's options under the implied-consent statutes. Finally, Spencer 's one-sentence description of the implied-consent statutes cannot fairly be reconciled with its holding that, if a driver's decision to take the breath test is the product of an Article I, section 11, violation, then the test results are subject to suppression.
For those reasons, we decline to put too much weight on Spencer 's one-sentence summary of the implied-consent statutes. Rather, we recognize, as both the text of the implied-consent statutes states and the holding in Spencer establishes, that a DUII suspect's decision to submit to a breath test is a necessary statutory predicate to obtaining a breath test under the implied-consent statutes and that a driver retains a statutorily recognized right to decide, at the point of arrest, whether to cooperate with the state and take a breath test. In short, Spencer and Newton , properly understood, do not support the state's argument.
That leaves this court's decision in Cabanilla , on which the state primarily relies. The difficulty for the state is that Cabanilla involved an interpretation of the word "informed" in ORS 813.130. 351 Or. at 626, 631-32, 273 P.3d 125. Specifically, the question in Cabanilla was whether, as a matter of statute, a defendant's refusal to take the breath test could be offered against him in a criminal proceeding when the defendant had not been fully "informed" of the adverse consequences of a refusal.[14] Id. Invoking the interpretation of the implied-consent statutes in the plurality decision in Newton and the majority decision in Spencer , **145 the court explained that the point of informing a DUII suspect of the adverse consequences of refusing to take breath test is not to ensure that the suspect's decision to refuse is knowing. Id. at 633-34, 273 P.3d 125. Rather, it is to persuade a suspect to submit to the test. Id. Accordingly, as a statutory matter, the fact that the defendant in Cabanilla did not fully understand the adverse consequences of his refusal did not preclude its admission against him in a criminal proceeding. Id.
The question that the court answered in Cabanilla - whether, as a statutory matter, a suspect's decision to refuse a breath test is admissible in a criminal proceeding only if it is informed-is different from the question presented here-whether a decision to submit to a breath test that is the product of a constitutional violation should be suppressed. We recognize that some of the statements in Cabanilla , viewed in isolation, could be interpreted as supporting the position that the state takes here. However, reading those statements in light of the statutory question that the court decided in Cabanilla and also in light of this court's holding in Spencer , we conclude that the implied-consent statutes do not require the admission of the breath test results when a DUII suspect's decision to take the breath test is the product of a violation of his or her Article I, section 12, right to counsel. The premise of the state's alternative argument fails.
The state raises one other issue in support of its implied-consent argument that requires a response. It argues that excluding the results of a breath test overcorrects for the Article I, section 12, violation. The state reasons *23 that "[a] defendant has no legal right, constitutional or otherwise, to withhold compliance with a breath test administered under the implied-consent law. Thus, exclusion of the implied-consent breath test evidence would not preserve rights 'to the same extent as if the government's officers had stayed within the law.' " (Quoting Vondehn , 348 Or. at 473, 236 P.3d 691.) In our view, the difficulty with the state's argument is its premise. As explained above, a DUII suspect does have a statutory right to decide whether to submit or refuse to submit to a breath test. When a suspect's decision to submit to a breath test is the product of a constitutional violation, **146 excluding the results restores the suspect to the position he or she would have been in if the state had not violated the suspect's rights in the first place.
Perhaps the state is arguing that the implied-consent statutes put a DUII suspect to a choice (submit to a breath test or have evidence of your refusal be admitted against you in a DUII prosecution) and that excluding a suspect's breath test results overcorrects for that violation by excusing the suspect from having to make that statutory choice. To the extent that is the state's point, it assumes that the state constitutionally can put a defendant to that choice, a question that this court has not yet answered. Beyond that, even if the implied-consent statutes can put a defendant to that choice consistent with the constitution, the state does not explain how its loss of a statutory benefit somehow out-weighs the vindication of a defendant's constitutional right. If our only choice in fashioning a remedy for the violation of a defendant's Article I, section 12, right is either to undercorrect for the violation of the defendant's constitutional right or to overcorrect for that violation by denying the state a statutorily created benefit, Spencer makes clear that the state's loss of a statutory benefit is a necessary consequence of remedying the state's violation of the defendant's constitutional right. Following Spencer and Durbin , we conclude that the breath test results should have been suppressed as a product of the violation of defendant's Article I, section 12, right to counsel.
III. CONCLUSION
For the reasons explained above, defendant's motion to suppress the breath test results as a product of the officer's Article I, section 12, violation should have been granted. Additionally, defendant plausibly argues on review that the admission of those test results affected both his DUII conviction and his reckless driving conviction, and the state does not argue otherwise. We accordingly reverse the judgment as to both convictions and remand the case to the trial court for further proceedings.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

We take the facts from the evidence admitted at the suppression hearing and state the facts consistently with the trial court's ruling.

At some point during this process, Enz told defendant that he did not have to answer all the interview questions if he did not want to do so.

The record discloses that the questions were "in part about the vehicle" and "about the driving." It also discloses that defendant declined to answer one of the questions. We note that, in a memorandum that defendant filed in support of one of his suppression motions, he identified a few of the questions asked but none of the answers given. In these circumstances, we do not rely on the factual assertions in the memorandum, which were neither offered nor admitted as evidence in the suppression hearing.

The Implied Consent Combined Report is an administrative form prepared by the Department of Transportation to comply with multiple statutory directives. See State v. Rafeh , 361 Or. 423, 425-26 and n. 2, 393 P.3d 1155 (2017) (discussing the Implied Consent Combined Report). The report can contain both statutorily required information and case-specific information that the officer adds to the form. See id. Although the record in this case does not contain a copy of the Implied Consent Combined Report, Officer Enz testified on cross-examination that he told defendant three consequences of refusing to take a breath test that are set out in the report: the loss of a person's driver's license and the receipt of a 30-day temporary permit if the person had a valid license; a fine of up to $650 and the right to request a hearing to challenge the validity of a license suspension; and, if defendant refused to take the breath test, that "evidence of that refusal would be used against him in court."

Even though Enz's questions and defendant's answers would not have been admissible in defendant's criminal trial, they were admissible in the suppression hearing and can be dispositive in deciding whether his decision to take the breath test was the product of the prior illegality. See Delong , 357 Or. at 381, 350 P.3d 433 (explaining that, even though illegally obtained evidence may not be admissible at trial, it is admissible at a suppression hearing to prove or disprove attenuation).

The state argues that Enz's violation was the result of the officer's good-faith but mistaken belief that defendant's right to counsel derived solely from Article I, section 11. That may be true. However, we suppress evidence that derives from a constitutional violation to return a defendant to the position that he or she would have been in had the officer stayed within constitutional bounds. The officer's good faith has no bearing on that analysis.

In Moore , the officer advised the defendant that "evidence of a refusal *** may be offered against [him]." 354 Or. at 505, 318 P.3d 1133. In concluding that that advice was not unlawful and thus did not render the defendant's consent involuntary, we noted that the advice stated only that a refusal "may be offered against him," not that evidence of a refusal would be admitted against him. Id. at 504-05, 318 P.3d 1133. We also observed that, because a refusal could be admitted in an administrative license suspension, the officer's advice in Moore was "more nuanced [and more] conditional" than advice that a refusal "is admissible in any civil or criminal proceeding." Id. In this case, Enz testified he told defendant that "evidence of [a] refusal would be used against him in court." That advice was neither conditional nor as nuanced as the advice in Moore . The question in this case, however, is not whether the officer's advice rendered defendant's consent involuntary; rather, it is whether the advice was sufficient to break the causal chain between the violation and defendant's decision to take the breath test. As explained above, it was not.

In Delong , the officers asked the defendant if he had anything in his car that they should be concerned about. 357 Or. at 368, 350 P.3d 433. In response, the defendant told the officer, " 'no,' and that if we wanted to search the vehicle, we could." Id. Later, we characterized defendant's response as an "invitation" to search his car. Id. at 379, 350 P.3d 433.

In stating that it is not relying on defendant's consent to justify a seizure and search of his breath, the state's argument assumes that neither implied consent nor defendant's decision to submit to a breath test at the point of arrest constituted sufficient consent to constitutionally justify a warrantless seizure and search of defendant's breath. Presumably for that reason, the state notes that its warrantless seizure and search of defendant's breath can be justified either as a search incident to an arrest or under the exigent circumstances doctrine. The state does not appear to argue that it is relying on either of those exceptions to the warrant requirement as a basis for obtaining defendant's BAC independently of his implied consent to take a breath test. However, to the extent the state is relying on those exceptions as independent bases for obtaining defendant's BAC, we cannot say that the record regarding exigent circumstances would be materially the same if that issue had been raised in the trial court, see Outdoor Media Dimensions, Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001), nor would we consider following Birchfield under Article I, section 9, without a more fully developed argument on that issue, see State v. Montez , 309 Or. 564, 604, 789 P.2d 1352 (1990).

The conduct that gave rise to this case occurred on February 13, 2013. On July 25, 2013, the legislature added the following subsection to ORS 813.100 :
"Nothing in this section [ORS 813.100 ] precludes a police officer from obtaining a chemical test of the person's breath or blood through any lawful means for use as evidence in a criminal or civil proceeding including, but not limited to, obtaining a search warrant."
Or. Laws 2013, ch. 642, § 1, codified as ORS 813.100(5). By its terms, the 2013 act does not apply to the conduct in this case. Or. Laws 2013, ch. 642, § 3. We express no opinion on how ORS 813.100(5) would apply in future cases.

The plurality explained that, as states were enacting implied-consent statutes, the United States Supreme Court made clear that blood tests for BAC did not implicate the due process concerns identified in Rochin . Newton , 291 Or. at 796-97, 636 P.2d 393. However, Congress made enactment of implied-consent statutes a condition of receiving federal highway funding, and all 50 states ultimately adopted such statutes. Id.

The plurality reasoned: "The warrant requirement may be excused if there is consent. By this, we mean actual consent. Defendant's statutorily implied consent cannot excuse an otherwise unconstitutional seizure." Newton , 291 Or. at 801, 636 P.2d 393.

Spencer had no occasion to decide whether either the consent implied from driving on the public highways or the decision to submit to a breath test at the point of arrest was sufficient in that case to justify a warrantless seizure and search of the defendant's breath. Rather, it held that the test results in that case derived from a violation of the defendant's Article I, section 11, right to counsel and should be suppressed for that reason.

Factually, the defendant's argument turned on the fact that the officer read the adverse consequences to him in English, which the defendant did not understand.