Submitted February 26, 2015, affirmed March 2, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANTHONY PETER COURVILLE,
*Defendant-Appellant.*

Marion County Circuit Court
12C46572; A154835

368 P3d 838

Peter Gartlan, Chief Defender, and Stephanie J. Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Peenesh H. Shah, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

LAGESEN, J.

## LAGESEN, J.

Defendant appeals from a judgment convicting him, after a stipulated facts trial, of two counts of sexual abuse in the first degree, ORS 163.427. He assigns error to the trial court's denial of his motion to suppress oral and written admissions that defendant made to the police officer who initially interviewed defendant about the victim's allegations of abuse. Defendant contends that under Article I, section 12, of the Oregon Constitution, and the Supreme Court's case law implementing that provision, suppression is required because (1) he was in "compelling circumstances" at the time that he made those admissions to the officer, and (2) the interviewing officer did not advise him of his *Miranda* rights. We conclude that the trial court correctly determined that defendant was not in compelling circumstances at the time he made the admissions and, accordingly, affirm.

We review a trial court's ruling on a motion to suppress to determine whether the court's findings of historical fact are supported by constitutionally sufficient evidence in the record, and whether the trial court correctly applied the applicable law. *State v. Ehly*, 317 Or 66, 75, 845 P2d 421 (1993). In so doing, we "presume that the facts were decided in a manner consistent with the court's ultimate conclusion," if the trial court did not make express findings of fact on all pertinent issues, and if the evidence allows for application of that presumption. *Id.* Pertinent to the issue presented by this appeal, we review for legal error a trial court's determination as to whether a defendant was in "compelling circumstances," so as to require the provision of *Miranda* warnings, accepting the trial court's findings of historical fact, provided that there is evidence in the record to support them. *State v. Burdick*, 186 Or App 460, 463, 63 P3d 1190 (2003).

As required by our standard of review, we state the facts in a manner that is consistent with the trial court's ultimate ruling. In June 2012, defendant, his wife, his wife's 17-year-old daughter A, and defendant's two children with his wife were living in Bend. One morning A called 9-1-1 to report that her mother (defendant's wife) was manic and attacking her with a frying pan. In the same phone call,

A reported that defendant had sexually abused her in the past, when the family had been living in Salem. Police responded to the house to address the frying-pan allegations. Later that day, Officer Ward conducted a more detailed interview with A in person, at the police station. In that interview, A told Ward that defendant had touched her vagina on two separate occasions while the family was living in Salem.

Ward and Officer Vincent went to defendant's house to follow up on what A had told Ward. Vincent knew the family from previous incidents and had a "pretty good rapport" with defendant and the rest of the family. Ward and Vincent asked a DHS worker to accompany them because some of the things that A had said caused them to have concern for the well-being of defendant's younger children. Vincent, Ward, and the DHS worker all took separate cars to defendant's house. Vincent and Ward were in uniform, armed, and drove marked patrol cars, but did not use lights or sirens. A rode to the house with Vincent and remained in the car once they were there.

When the officers and the DHS worker arrived, defendant was sitting in a chair in his yard. As the officers and DHS worker approached the gate to the yard, Vincent and defendant started talking. Vincent asked if defendant's wife was around and also told defendant that they "need[e]d to talk about some stuff." Ward and the DHS worker went inside the house to speak with defendant's wife, and Vincent and defendant sat outside in some plastic chairs in defendant's backyard. According to Vincent, the two were "just BS'ing for the most part" for five or 10 minutes. While they were talking, defendant's wife would come to the back door of the house and scream at them. Vincent asked defendant if there was someplace that they could talk where they would not be distracted by defendant's wife, and defendant led Vincent to a side yard. The two continued to talk about the different yard projects that defendant had going or had planned. Defendant asked if Vincent had a cigarette, and Vincent gave him one.

Eventually, Vincent told defendant that A had made allegations that defendant had touched her vagina while the

family was living in Salem. Vincent also told defendant that he was not going to take defendant to jail that day, but just wanted "to find out the truth and then we'll go from there." Vincent explained that he wanted to be fair to both defendant and to A, and asked defendant whether defendant had ever touched A's vagina. Defendant denied doing so.

The two then talked about a number of other different topics for awhile. After vacillating among multiple topics, Vincent told defendant that they needed to focus on A again. He told defendant that A had said that defendant had inappropriately kissed her and touched her vagina. In response, defendant told Vincent that he would "be honest." Defendant then told Vincent that he had touched A's "butt" once. Vincent responded that A had not said anything about defendant touching her "butt," only that he had touched her vagina. Defendant said that he had touched A's "butt" intentionally and that, if he touched her vagina, it was an accident. Defendant explained that he had touched A's "butt" by rubbing it while he was in bed with her.

Vincent encouraged defendant to be honest, telling defendant that honesty was important both for defendant's sake and for A's benefit, and that A "needs her dad to be accountable." Defendant changed the subject again and went back to talking about a fight that he had had with his brother. Vincent directed the conversation back to A's allegations. Vincent told defendant that "you and I both know what happened," and that "[A] knows what happened." Vincent also stated that he thought the real issue was that defendant did not "want to be labeled a [child molester] in jail," and encouraged defendant to tell the truth for the benefit of A.

Although defendant nodded in response to what Vincent said, he did not confirm A's allegations. Vincent then said:

> "Let's talk about the big white elephant that's standing right next to us that you don't want to talk about. You touched her vagina and you're afraid about what will happen to you. This isn't about you right now, this is about [A] and what she needs."

At that point, defendant interrupted Vincent and told him that he had touched A's vagina once. Vincent thanked defendant for "being honest," and encouraged defendant to provide more information. In response, defendant provided more information about the touching. Defendant's description of the event matched A's. Defendant also continued to acknowledge that he might have, by accident, touched A's vagina a separate time, during the incident in which he had been rubbing her butt while they were in bed.

After defendant made the admissions, Vincent stated that he would forward the information on to the Marion County District Attorney. Vincent also told defendant that, as a result of the allegations, DHS would probably have to limit defendant's access to his children. Vincent then asked defendant if there was anything that he would like to pass on to A. Defendant said to tell A that he was sorry. Vincent then gave defendant a notepad and a pen or pencil in case defendant wanted to write an apology note to A. Vincent left defendant alone for about five minutes; when Vincent returned, defendant had written a brief note to A stating that "it should never have happened." Vincent took the note. Vincent did not take defendant into custody.

The entire interview lasted between an hour and an hour-and-a-half. Vincent did not provide defendant with *Miranda* warnings at any point during the interview. Throughout the entire interview, the tone was friendly and conversational. At no point did Vincent restrict defendant's movement, or otherwise suggest to defendant that he was not free to end the conversation. Defendant's son was playing in the yard nearby as defendant and Vincent were talking.

As noted, defendant moved to suppress the evidence of his oral admissions to Vincent as well as his written apology. He contended that the circumstances under which Vincent conducted the interview were compelling, so as to require the provision of *Miranda* warnings. Vincent's failure to provide those warnings, defendant argued, required suppression of his statements. The trial court denied the motion, concluding that the circumstances were not "compelling" and, consequently, Vincent had not been required to provide defendant *Miranda* warnings. Defendant appeals.

To implement the right against self-incrimination protected by Article I, section 12, the Oregon Supreme Court has held that officers must provide *Miranda* warnings to a suspect before interrogating that suspect if the suspect either is in "full custody" or in "compelling circumstances." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006). Here, there is no dispute that defendant was interrogated. There is also no dispute that defendant was not in full custody. Rather, the question is whether the interrogation took place in "compelling circumstances." "Compelling circumstances" exist when the circumstances are such that an objectively reasonable person would feel compelled to answer the officer's questions. *State v. Heise-Fay*, 274 Or App 196, 201-02, 360 P3d 615 (2015).

We assess the totality of the circumstances in which a defendant was interrogated in order to determine whether the interrogation took place under circumstances that required the provision of *Miranda* warnings. We consider, among other things, (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter. *Id.* at 202. "Except in the most extreme cases, no single factor is dispositive." *Id.* at 203. The "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641.

Here, many of the circumstances in which defendant was interrogated point toward the conclusion that defendant was not in compelling circumstances. Defendant was questioned in his own back yard by a single officer who was friendly and conversational. Defendant was told from the outset that he would not be arrested that day. Although another officer was present, along with a DHS worker, they were inside the house with defendant's wife to address a different matter, and were not present during the interview. Defendant picked the place in the yard where the interview was conducted, and was never restricted in his ability to move or to end the interaction. Defendant's son was playing nearby throughout the interview. Much of the interview was spent talking about other matters, such as defendant's

ongoing projects in the yard. Such familiar surroundings and mundane conversational topics, tend to "diminish[] the police-dominated atmosphere that the *Miranda* warnings were intended to counteract." *State v. Shaff*, 343 Or 639, 646, 175 P3d 454 (2007).

On the other hand, Vincent's questions to defendant exerted pressure on defendant to talk. Defendant indicated a desire not to answer Vincent's questions throughout the interview by changing the topic or by simply not saying anything in response to the questions. Vincent, however, kept encouraging defendant to talk. Vincent indicated to defendant several times that, in Vincent's view, A was telling the truth. Vincent also stated several times that defendant needed to admit to the truth of A's allegations for A's benefit. In addition, Vincent made other statements that assumed defendant's guilt and suggested that, by not admitting his guilt to Vincent, defendant was putting his own fears about what would happen to him in prison over his parental obligation to A. As the United States Supreme Court recognized in *Miranda*, that type of questioning—which projects an "aura of confidence" in the suspect's guilt—"undermines [the suspect's] will to resist" answering questions. *Miranda v. Arizona*, 384 US 436, 455, 86 S Ct 1602, 16 L Ed 2d 694 (1966). Our own Supreme Court has recognized the same point. *Roble-Baker*, 340 Or at 643 n 8 (citing *Miranda*, 384 US at 455).

Those competing circumstances make this a close case to decide: The setting in which the interview was conducted was not dominated by police or otherwise particularly compelling, but the manner of questioning exerted pressure on defendant to speak. Ultimately, our precedent dictates our decision. As the state points out, we previously confronted the question of whether a similar set of circumstances was compelling in *State v. Saunders*, 221 Or App 116, 188 P3d 449, *rev den*, 345 Or 216 (2008) (*Saunders II*). In that case, two detectives interrogated the defendant for one to one-and-a-half hours regarding allegations by his girlfriend's daughter that the defendant had sexually abused her. *State v. Saunders*, 211 Or App 73, 76, 153 P3d 144 (2007), *vac'd and rem'd for recons*, 344 Or 277, 179 P3d 671 (2008) (*Saunders I*). The interview took place in

the defendant's kitchen. However, during the course of the interview, the detectives, as Vincent did here, asked about the victim's allegations, made a number of statements that assumed the defendant's guilt, told the defendant that they thought that he had committed the alleged abuse, encouraged the defendant to be honest with them, and urged the defendant to tell them if he was sorry that the abuse had happened, because it was important for detectives to "document" the defendant's remorse if he had any. *Saunders I*, 211 Or App at 77-82.

We originally held that the defendant had been interrogated under compelling circumstances. We reasoned that the manner of questioning the defendant, which assumed his guilt and urged him to express remorse, exerted pressure on the defendant to admit to the conduct. That pressure, we concluded, transformed the interrogation conducted in the defendant's kitchen into an interrogation conducted under compelling circumstances. *Id.* at 82-83. However, the Supreme Court vacated our decision and remanded it for reconsideration in the light of its decision in *Shaff. State v. Saunders*, 344 Or 277, 179 P3d 671 (2008). On remand, we reversed our prior determination that the defendant had been questioned in compelling circumstances. We concluded that, under *Shaff*, the pressure exerted on the defendant by the detectives' manner of questioning the defendant "did not make the circumstances compelling." *Saunders II*, 221 Or App at 120. Specifically, we concluded that what the detectives had done in questioning the defendant did not involve the sort of coercion that *Shaff* held was required to render otherwise non-compelling circumstances compelling based on the manner of questioning employed by interrogating officers. *Id.*

It is difficult to meaningfully distinguish the circumstances that we determined were not compelling in *Saunders II* from the circumstances in which defendant was interrogated in this case. For that reason, we conclude that the trial court did not err when it concluded that defendant was not interrogated in compelling circumstances and, therefore, did not err when it denied defendant's motion to suppress.

Affirmed.